```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NATHANIEL JAMES,
```

      Petitioner,        **MEMORANDUM AND ORDER**
                       07-CV-2572 (RRM)

  - against -

ROBERT ERCOLE, Superintendent,
Green Haven Correctional Facility.

      Respondent.
------------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge.

  On March 20, 2002, after trial in New York Supreme Court, Kings County, a unanimous jury found petitioner Nathanial James guilty of second degree murder, assault and menacing, and sentenced to to consecutive terms of imprisonment of twenty-five years to life on the murder count, and one year each on the assault and menacing counts. On June 26, 2007, after an unsuccessful direct appeal in state court and a denial of an application for a writ of error *coram nobis*, James filed this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. For the reasons state below, James's application for habeas relief is DENIED, and the petition is DISMISSED.

## BACKGROUND[1]

### A. Trial

#### 1. The Altercations

A series of altercations occurring on October 23, 1997 culminated in the death of the victim, Kenneth Deane.[2] Kenneth Deane, and his uncle, Derrick Deane, lived in 2832 West 23rd Street, Apartment 5A, in the Coney Island neighborhood of Brooklyn. (Transcript of the Record ("Tr.") at 248.) The two of them, along with Robert Summers, sold drugs in the neighborhood, and had been having trouble with James[3] and his associates, who also sold drugs in the area. (*Id*. at 253–54, 328–29, 415.)

On the morning of October 23, 1997, Derrick Deane's friend punched "Tommy," James's friend. (*Id*. at 250–251.) In retaliation, James and his associates attacked Robert Summers while he was riding his bike. (*Id*. at 209–10, 229–30, 405–07, 439–40.) Summers eventually escaped his attackers and sought refuge in Kenneth and Derrick Deane's apartment. (*Id*. at 210–11, 232–33, 407–08, 435.) After seeing Summers's injuries, Kenneth Deane, Derrick Deane and others set out to find James and his group, but did not find them and returned to the Deanes' apartment. (*Id*. at 256–58, 408–09.) The group then watched a movie and Derrick Deane ordered pizza. (*Id*.) When the delivery arrived, Derrick Deane went downstairs to get it. (*Id*. at 258–59, 409.)

As Derrick Deane walked towards the delivery car, he saw James and others running towards him brandishing golf clubs and baseball bats. (*Id*. at 259, 282, 289–90, 317–18.) He ran

---

[1] James was tried twice. In his first trial, James was convicted of second degree murder, third degree assault and two counts of second degree menacing, but his conviction was reversed by the New York Supreme Court, Appellate Division, Second Department. *See People v. James*, 284 A.D.2d 409 (2d Dep't 2001). In his second trial, James was again convicted of second degree murder, third degree assault and two counts of second degree menacing. The following discussion refers to the record of the second trial.
[2] Kenneth Deane was also known as "Fen." (*See, e.g.*, Tr. 381.)
[3] James was also known as "Bless" and "Buddha." (*See, e.g., id.* at 407.)

2

towards a nearby housing police office for safety. (*Id*. at 259–60.) As he approached the police office, James and his group stopped chasing Derrick Deane, and instead turned back towards Deane's building. (*Id*. at 260–61.) Derrick Deane sought refuge in a friend's apartment, and tried to call Kenneth Deane to warn him about James and his group. (*Id*. at 261, 291.)

**2. The Shooting**

Before Derrick Deane was able to call Kenneth Deane, James and one of his associates entered the elevator in Deane's building, where they found Terezette Malone. (*Id*. at 212.) At that time, Malone abused drugs, and had used crack cocaine and alcohol for the three days prior to October 23, 1997. (*Id*. at 213, 236–37.) Malone also experienced auditory and visual hallucinations. (*Id*. at 214–17, 223–24.) Malone testified that when James entered the elevator he put a gun to her head and said, "If you tell anybody, bitch, I kill you." (*Id*. at 212, 220–21, 241–42.) James took Malone to the fifth floor and ordered her to knock on the Deanes' apartment. (*Id*. at 212, 220–21.) After hearing the peephole open and close, James said "kick that bitch down the steps, do something with her," at which point Malone fled from the building. (*Id*. at 212–13.)

Kenneth Deane opened the apartment door. (*Id*. at 410.) Although he did not initially mention it to investigators, (*id*. at 455–56), at trial Summers testified that he saw James's face in the right side of the doorway, (*id*. at 410–13, 427, 446, 449–50.) Christina Rosario, who was Kenneth Deane's girlfriend and in the apartment that day, did not see anyone's face, but saw a yellow sleeve outside the opened door. (*Id*. at 381–82, 396) Kenneth Deane stepped out into the hallway, and shortly thereafter, gunshots rang out. (*Id*. at 381, 410.) Kenneth Deane stumbled back into the apartment as more gunshots came from the right side of the open door. (*Id*. at 410,

3

413–414, 443–44.) Kenneth Deane was eventually taken to a hospital, where he died. (*Id*. at 263.)

After searching for him for several months, the police eventually arrested James for the murder. In December 2001, Derrick Deane was arrested for an unrelated drug offense and was incarcerated on Riker's Island, where James was also incarcerated. When James saw Derrick Deane, James said, "Come to the yard tomorrow. I got something for you. I'm going to give you the same thing I gave your nephew." (*Id*. at 268–70.)

### 3. James's Testimony at Trial

James testified at trial that on the afternoon of October 23, 1997, he saw two of his associates, "Rakim" and "Tommy" chasing Derrick Deane. He said that he went into the building with Rakim and Tommy "thinking that we were going to fight" and "not knowing what's going on." (*Id*. at 632–34.) He testified that he went to "the fifth floor but [] didn't get all the way out the exit and [] heard some shots." Rakim and Tommy returned and all three of them exited the building. (*Id*. at 634) When they returned to James's car, Rakim and Tommy told him that they had shot Kenneth Deane. (*Id*.) James testified that he did not know that Rakim and Tommy were going to shoot Kenneth Deane. (*Id*. at 634, 639.)

## B. Post-Conviction Proceedings

James was convicted of second degree murder, third degree assault, and two counts of second degree menacing. On April 10, 2002, James was sentenced to consecutive prison terms of twenty-five years to life for the murder charge, and one year each for the assault and menacing charges. James timely appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department. There, he argued that the evidence was insufficient to convict him

4

for murder, and that the sentence he received was vindictive. On April 25, 2005, the Appellate Division affirmed James's conviction. *People v. James*, 17 A.D.3d 696, 697 (2d Dep't 2005). James then timely sought leave to appeal to the New York State Court of Appeals. On June 28, 2005, the Court of Appeals denied James's application. *People v. James*, 5 N.Y.3d 764 (2005). James did not file a petition for *certiorari* in the United States Supreme Court.

On August 14, 2006, James, through different counsel, applied for a writ of error *coram nobis* in the Appellate Division, arguing that his appellate counsel was ineffective for raising claims on appeal that had a low likelihood of success instead of other more meritorious claims.[4] (*See* Pet'r *Coram Nobis* (Doc. 7-4).) The state opposed the application, and included an affirmation from James' appellate counsel. (*See* Appellate Counsel's Affirm. (Doc. 7-2); Affirm. in Opp. to *Coram Nobis* (Doc. 7-3).) On February 20, 2007, the Appellate Division denied the *coram nobis* application. *People v. James*, 37 A.D.3d 736 (2d Dep't 2007). On May 22, 2007, the New York Court of Appeals denied leave to appeal from the Appellate Division's decision. *People v. James*, 8 N.Y.3d 986 (2007).

On June 26, 2007, following the denial of *coram nobis*, James, through counsel, timely filed the instant petition for habeas corpus. (*See* Petition (Doc. 1); Pet'r Memo (Doc. 2).) He raises two claims: (1) the evidence was insufficient to convict him of second degree murder; and (2) appellate counsel provided ineffective assistance by failing to raise allegedly meritorious claims.

---

[4] These purportedly meritorious claims were: (1) the trial court erred when it allowed the prosecution to elicit hearsay and bolstering testimony from the detective in charge of the investigation; (2) the admission of evidence that James was a drug dealer deprived him of a fair trial; and (3) the prosecutor made improper remarks during summation.

**STANDARD OF REVIEW**

In deciding whether to grant a federal habeas corpus petition, the Court must apply the standard of review set forth by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The AEDPA requires a rigorous standard of review with regard to petitions filed by state prisoners. *See Williams v. Taylor*, 529 U.S. 362, 402–03, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). Under the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C § 2254(d)(1)–(2). Though the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are analyzed independently, both limit the source of clearly established law to the Supreme Court's jurisprudence. *Williams*, 529 U.S. at 404–05, 412; *see also Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002)).

A state court "adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.*; *accord Johnson v. Williams*, 568 U.S. —, 2013 WL 610199, at *6 (2013) ("'[w]hen a federal claim has been presented to a state court and the state court has

denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" (quoting *Harrington v. Richter*, 562 U.S. —, 131 S. Ct. 770, 784–85, 178 L.Ed.2d 624 (2011))).

The Supreme Court has noted that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06.

Further, the Supreme Court has held that, with respect to the "unreasonable application" clause, a federal court may grant a petitioner's writ of habeas corpus "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407. The state court's application, however, must be "objectively unreasonable," *id*. at 409–10, a "higher threshold" than "incorrect." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L.Ed.2d 251 (2009).[5] Moreover, if a federal court "finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." *Howard*, 406 F.3d at 122 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993)).

---

[5] According to the Second Circuit, however, though "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (citations and internal quotation marks omitted).

7

## DISCUSSION

**1. Sufficiency of the Evidence**

First, James argues that the evidence was legally insufficient to establish his guilt of the crime of second degree murder. (Pet'r Memo (Doc. 2), at 7 (ECF Pagination).) He claims that the prosecution failed to present an eyewitness that saw James shoot Kenneth Deane, (*id.* at 8), and that the testimony of Terezette Malone was not credible because she was inconsistent and a drug addict with psychiatric problems, (*id.* at 8–9.) Therefore, he argues, "New York courts unreasonably applied [*Jackson v. Virginia*, 443 U.S. 307 (1979)] when they found that the evidence was legally sufficient." (*Id*. at 9.) James's insufficiency of the evidence claim is meritless.

This claim was presented to the Appellate Division and adjudicated on the merits, *see James*, 17 A.D.2d at 696–97 ("Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt, based upon an acting-in-concert theory."), so the Appellate Division's decision will stand unless it was "contrary to" or involved an "unreasonable application" of the federal constitutional law clearly established in *Jackson*.

Under *Jackson*, a federal habeas court considering an insufficiency of the evidence challenge must uphold the state court conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The Court must defer to the jury's determination of the weight given to conflicting evidence, witness credibility, and inferences drawn from the evidence. *United States v. Vasquez*, 267 F.3d 79, 90–91 (2d Cir. 2001) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L.Ed. 680 (1942)). This

"inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993) (emphasis in original). In addition, the Court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988). Accordingly, in order to prevail on his insufficiency of evidence claim, James must prove, after viewing the evidence in the light most favorable to the prosecution, that it was objectively unreasonable for the Appellate Division to conclude that any rational trier of fact could have found the essential elements of second degree murder beyond a reasonable doubt. This is a heavy burden, *see United States v. Griffith*, 284 F.3d 338, 348 (2d Cir. 2002), one which James has not carried.

Simply put, the Appellate Division's decision was not an unreasonable application of *Jackson*. James was convicted of second degree murder under N.Y. Penal Law § 125.25(1), which states that a person is guilty of murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person."[6] The state's evidence, when viewed in the light most favorable to the prosecution, could have reasonably led a rational trier of fact to find the essential elements of second degree murder. Bad blood existed between James's group and Kenneth Deane's group as they were rival drug dealers competing for turf. On the day the murder occurred, James attacked and attempted to attack several different

---

[6] Under the so-called "acting-in-concert" or "community purpose" doctrine, a person may be criminally liable for the conduct of the principal actor "when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00; *accord People v. Allah*, 71 N.Y.2d 830 (1998). "Intent can be established from the act itself or from the defendant's conduct and the surrounding circumstances." *People v. Armistead*, 178 A.D.2d 607, 608 (2d Dep't 1991) (citing *People v. Bracey*, 41 N.Y.2d 296 (1977); *People v. Turner*, 141 A.D.2d 878 (2d Dep't 1988).

9

associates of Kenneth Deane. After failing to seize Derrick Deane, James and his group returned to Kenneth Deane's building, where James forced Terezette Malone by gunpoint to knock on the victim's door.[7] Once the victim opened the door, James was seen outside of the apartment. James himself admitted to being on the fifth floor when the murder occurred. Finally, when they were both incarcerated on Riker's Island, James threatened the victim's uncle, Derrick Deane, by saying, "I'm going to give you the same thing I gave your nephew." When presented with this evidence, a rational trier of fact could have concluded that James intended to cause Kenneth Deane's death or intentionally aided others in doing so. Therefore, the Appellate Division did not unreasonably apply *Jackson* when it denied James's appeal, and James's insufficiency of the evidence claim fails.

2. **Ineffective Assistance of Appellate Counsel**

James also argues that he was deprived of his constitutional right to effective assistance of appellate counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). (Pet'r Memo, at 10.) He argues that, although the claims presented by appellate counsel were "certainly not frivolous ones," (*id.* at 11), appellate counsel failed to advance several substantial claims, (*id.* at 12). These purportedly substantial claims include: (1) that the prosecutor elicited impermissible hearsay and bolstering testimony from a detective (*id.* at 13); (2) that the admission of evidence that James was a crack dealer deprived James of his right to a

---

[7] Although James argues that Malone was not a credible witness by virtue of her drug use and psychiatric problems, Malone testified that she was aware of what was going on around her and that she could always differentiate between the voices in her head and reality. (*See* Tr. 216, 246.) The Court must presume that the jury weighed the competing inferences and arguments with regard to Malone's credibility and resolved the issues in favor of the prosecution. *See Jackson*, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

fair trial (*id.* at 16) and; (3) that the prosecutor made improper remarks during summation (*id.* at 20). James argues that if these claims were raised, "there would have been a greater likelihood that [his] conviction would have been reversed on appeal," and therefore James was deprived of his constitutional right to assistance of effective appellate counsel. (*Id.* at 23.) This claim is also meritless.

The Appellate Division considered this argument in denying James's *coram nobis* application. *People v. James*, 37 A.D.3d 736 (2d Dep't 2007) ("The appellant has failed to establish that he was denied the effective assistance of appellate counsel." (citing *Jones v Barnes*, 463 US 745 (1983))). As such, the claim was adjudicated on the merits and will stand unless it was "contrary to" or involved an "unreasonable application" of the federal constitutional law clearly established in *Strickland*.

Under *Strickland*, to establish a claim of ineffective assistance of counsel, a petitioner must show: (1) that "counsel's representation fell below an objective standard of reasonableness" and; (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694; *accord Smith v. Robbins*, 528 U.S. 259, 285 (2000). When the claim is that appellate counsel failed to raise certain issues, a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issue that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *see also Ramchair v. Conway*, 601 F.3d 66, 74 (2d Cir. 2010) (finding that appellate counsel was constitutionally ineffective where counsel pursued claim that had "minimal chance of success" while failing to argue claim that was "constitutionally mandatory."). "[I]t is difficult to demonstrate that counsel was incompetent" when the *Strickland*

claim is based on counsel's failure to raise particular claims, *Smith*, 528 U.S. at 288, since "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L.Ed.2d 434 (1986) (quotations omitted). In other words, appellate counsel is not required to raise every nonfrivolous claim, but "rather may select from among them in order to maximize the likelihood of success on appeal." *Smith*, 528 U.S. at 288; *see also Knowles*, 556 U.S. 111 at 127. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

The Appellate Division's decision was not an "unreasonable application" of *Strickland*. James concedes that appellate counsel presented non-frivolous arguments before the Appellate Division. (Pet'r Memo, at 11–12; Pet'r *Coram Nobis*, at 10 (ECF Pagination).) Although James now argues that the omitted claims were stronger and should have been presented,[8] James's appellate counsel explained that in his estimation at the time the omitted arguments were meritless and not likely to succeed on appeal. (Appellate Counsel's Affirm. (Doc. 7-2).) Indeed, the state presented forceful arguments as to why the omitted issues were meritless, including, among other things, that certain of these claims were unpreserved for appellate review. (Affirm. in Opp. to *Coram Nobis* (Doc. 7-3).) Given these submissions, it was reasonable for the Appellate Division to conclude that the omitted issues were not clearly stronger and more significant than those presented, and that, therefore, James had failed to show that appellate

---

[8] Interestingly, although James implied in his *coram nobis* petition that the insufficiency of the evidence claim presented by appellate counsel was weak and bound to fail, (*see* Pet'r *Coram Nobis,* at 10), here he argues that the very same insufficiency of the evidence claim justifies *habeas* relief, (*see* Pet'r Memo, at 8–9.)

12

counsel's representation fell below an objective standard of reasonableness.  Accordingly, the Appellate Division did not unreasonably apply the *Strickland* standard, and James's ineffective assistance of appellate counsel claim must fail.

## CONCLUSION

For the forgoing reasons, it is hereby ORDERED that the instant habeas corpus petition is DENIED in its entirety.   The Clerk of Court is directed to enter judgment accordingly, and close this case.

SO ORDERED.

Dated: Brooklyn, New York　　　　　　　*Roslynn R. Mauskopf*
　　　　February 28, 2013
　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　ROSLYNN R. MAUSKOPF
　　　　　　　　　　　　　　　　　　　　United States District Judge